UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

HANNA SAWKA, *as Administratrix of the Estate of Jan Sawka*; and HANNA SAWKA, *Individually as Daughter of Decedent Jan Sawka*,

                              **Plaintiffs,**

  vs.                                          1:19-cv-1156
                                                     (MAD/TWD)

UNITED STATES OF AMERICA,

                              **Defendant.**
_____

APPEARANCES:                                OF COUNSEL:

**MORELLI LAW FIRM, PLLC**            **BENEDICT PETER MORELLI, ESQ.**
777 Third Avenue, 31st Floor             **JENNIE LORRAINE MADDEN-**
New York, New York 10017              **SHATYNSKI, ESQ.**
Attorneys for Plaintiff

**OFFICE OF THE UNITED STATES**    **RANSOM P. REYNOLDS, III, AUSA**
**ATTORNEY - SYRACUSE**
P.O. Box 7198
100 South Clinton Street
Syracuse, New York 13261
Attorneys for Defendant

**Mae A. D'Agostino, U.S. District Judge:**

### MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

      On September 18, 2019, Plaintiffs commenced this action against Defendant United States of America alleging negligence, wrongful death, and medical malpractice under the Federal Tort Claims Act ("FTCA"). *See* Dkt. No. 1. Plaintiffs are the widow and daughter of decedent Jan Sawka, both named Hanna Sawka. Plaintiffs allege that Dr. Marek Balutowski's negligent treatment of the decedent led to a fatal heart attack on August 9, 2012. *See id.* at ¶ 26. On

1

January 14, 2022, Plaintiffs filed a motion for partial summary judgment as to liability for the medical malpractice claim. *See* Dkt. No. 43. For the following reasons, Plaintiffs' motion is denied.

## II. BACKGROUND

On August 9, 2012, Jan Sawka died of a myocardial infarction at sixty-five years old. Dkt. No. 44-1 at ¶¶ 1, 52. Two years prior to his death, on May 5, 2010, the decedent was prescribed twenty milligrams of Simvastatin, a statin medication that helps prevent myocardial infarctions by lowering low-density lipoprotein ("LDL") cholesterol and stabilizing plaque in the vessels, by Dr. Zubair Ahmed Syed. *Id.* at ¶¶ 13, 14. One year later, and one year before the decedent's death, on April 29, 2011, Dr. Marek Balutowski discontinued the Simvastatin prescription. *Id.* at ¶ 32.

Beginning in May 2010, and until his death, the decedent was a patient of Dr. Balutowski. *Id.* at ¶ 21. Dr. Balutowski discontinued Simvastatin because the decedent's LDL had not been substantially affected by the statin medication and it had negative side effects on the decedent. *Id.* at ¶ 34. On April 30, 2010, prior to the Simvastatin prescription, the decedent's LDL was 118. *Id.* at ¶ 11. On July 29, 2010, it was 111, and on April 26, 2011, it was 119. *Id.* at ¶¶ 24, 31. After the Simvastatin was discontinued, the decedent's LDL went up to 123 on February 22, 2012, but then dropped to 97 by June 27, 2012, approximately two weeks before his death. *Id.* at ¶¶ 40, 41.

The decedent had a medical history which included diabetes, hypertension, peripheral vascular disease, and benign hand tremors. *Id.* at ¶ 9. On June 4, 2010, to treat his peripheral vascular occlusive disease, the decedent underwent a left superficial femoral artery endovascular

stent.  *Id.* at ¶ 18.  In December 2010, to further address the decedent's leg pain, he underwent femoral popliteal bypass surgery.  *Id.* at ¶ 30.

On December 13, 2010, prior to the surgery, the decedent underwent a cardiac stress test at Capitol Cardiology.  *Id.* at ¶ 28.  An echocardiography revealed "left ventricular hypertrophy as well as abnormal mitral inflow pattern with reversal of the E-A waves which was consistent with left ventricular diastolic dysfunction."  *Id.* at ¶ 95.  Diastolic dysfunction and ventricular hypertrophy are risk factors for a myocardial infarction.  *Id.* at ¶¶ 96, 97.  The decedent also underwent a treadmill exercise EKG test.  *Id.* at 102.  The decedent received a Duke Treadmill Score of -8, which correlates to an "82.2% risk of having a 75% stenosis or greater in at least one of the three major coronary arteries and a nearly 40% risk of having [more than] 75% stenosis in either all three vessels or the left main coronary."  *Id.* at ¶¶ 104, 105.  Dr. Balutowski, however, contends that he was not aware of the results of the decedent's preoperative evaluation.  Dkt. No. 44-1 at ¶ 162.

Plaintiffs' experts testified that Dr. Balutowski's decision to end the Simvastatin prescription and the failure to identify other risk factors and take proactive action departed from acceptable standards of care and proximately caused the decedent's death.  *See* Dkt. Nos. 43-7, 43-8.  Dr. Howard Sachs is board certified in cardiology and Dr. Americo Simonini is board certified in internal medicine.  *See* Dkt. No. 43-7 at 12-17; Dkt. No. 43-8 at 13-20.  Plaintiffs' experts identified nine standards of care that Dr. Balutowski departed from:

> Standard 1: The standard of care in this case required, among other things, continued monitoring of Mr. Sawka's low density cholesterol levels (LDL) and the continued administration of statin medications in order to maintain Mr. Sawka's LDL below one hundred in order to prevent cardiac issues.  The standard of care required that Mr. Sawka receive ongoing medical intervention in the form of cholesterol lowering medications, and monitoring of his

3

> LDL cholesterol level with the medically appropriate response to same.
>
> Standard 2: The standard of care requires that the discontinuation of a statin requires that the reasons [for discontinuation] be documented with specificity.
>
> Standard 3: The standard of care mandates that when a medication is discontinued, a differential diagnosis regarding other potential causes of reported side effects be considered and documented, allowing for additional or different treatment.
>
> Standard [4]: The standard of care requires the documentation of physical findings to support the need for cessation of an indicated statin medication.
>
> Standard [5]: The standard of care requires that if a statin is discontinued for adverse events, such as muscle aches, the patient must be offered alternatives to address his or her complaints to enable the patient to continue taking the statin.
>
> Standard [6]: The standard of care also requires that the risks of stopping statin medications be explained to the patient, and documented accordingly.
>
> Standard [7]: There are other cholesterol lowering medications available to patients who cannot tolerate statins and the standard of care requires that these medications be started when statins are not a viable treatment option.
>
> Standard [8]: The standard of care also requires, under circumstances such as this, *i.e.*, a patient of Mr. Sawka's age with comorbidities of diabetes, hypertension, and extensive peripheral vascular disease, the referral to a cardiologist for evaluation and treatment.
>
> Standard [9]: The standard of care requires the documentation of abnormal laboratory results.

Dkt. No. 43-18 at 9-10.

## III. DISCUSSION

**A.    Standard of Review**

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "'cannot try issues of fact; it can only determine whether there are issues to be tried.'" *Id.* at 36-37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

"'Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.'" *Jeffreys v. City of New York*, 426 F.3d 549, 553-54 (2d Cir. 2005) (quotation omitted). "However, '[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* (quoting *Anderson*, 477

5

U.S. at 252). "To defeat summary judgment, therefore, nonmoving parties 'must do more than simply show that there is some metaphysical doubt as to the material facts,' ... and they 'may not rely on conclusory allegations or unsubstantiated speculation.'" *Id.* (quotations omitted).

**B.     Applicable Law**

The FTCA empowers the federal district courts with the "exclusive jurisdiction of civil actions on claims against the United States, for money damages, … for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government." 28 U.S.C. § 1346(b)(1). For there to be liability, the employee's act must have taken place "while acting within the scope of his [or her] office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." *See id.* The language, "the law of the place," means that the courts must apply "the whole law of the State" in which the alleged negligent acts occurred. *Richards v. United States*, 369 U.S. 1, 11 (1962). Accordingly, the Court applies New York law to Plaintiffs' claims.

To establish a claim for medical malpractice under New York law, a plaintiff must prove (1) that the defendant breached the relevant standard of care, and (2) that the breach proximately caused the plaintiff's injuries. *See Arkin v. Gittleson*, 32 F.3d 658, 664 (2d Cir. 1994) (citing *Gibson v. D'Amato*, 97 A.D.2d 905, 905 (3d Dep't 1983)). "In order to show that the defendant has not exercised ordinary and reasonable care, the plaintiff ordinarily must show what the accepted standards of practice were and that the defendant deviated from those standards or failed to apply whatever superior knowledge he had for the plaintiff's benefit." *Sitts v. United States*, 811 F.2d 736, 739-40 (2d Cir. 1987) (citing *Toth v. Cmty. Hosp. at Glen Cove*, 22 N.Y.2d 255, 261, 239 N.E.2d 368, 372 (1968)). And to show proximate cause, the plaintiff must show that the

defendant's breach of duty of care is "a substantial cause of the events which produced the injury." *Mann*, 300 F. Supp. 3d at 419 (quoting *Mazella v. Beals*, 27 N.Y.3d 694, 706 (2016)).  New York law requires that, "'except as to matters within the ordinary experience and knowledge of laymen, … expert medical opinion evidence is required' to make out both elements."  *Milano v. Freed*, 64 F.3d 91, 95 (2d Cir. 1995) (quoting *Fiore v. Galang*, 64 N.Y.2d 999, 1001 (1985)).

"Where a plaintiff demonstrates through the affirmation of an expert that the defendant departed from accepted standards of medical care and that this departure was a substantial cause of her injuries, the burden of production shifts to the defendant to raise a triable issue of fact." *Hutchinson v. United States*, No. 01-CV-1198, 2006 WL 1154822, *6 (E.D.N.Y. Apr. 28, 2006) (citing *Console v. Wyckoff Heights Medical Center*, 19 A.D.3d 637 (2d Dep't 2005)).  "The failure of the defendant to do so entitles the plaintiff to summary judgment on the issue of liability."  *Id.*

Plaintiffs assert that a defendant is required to rebut a *prima facie* case with expert testimony.  *See* Dkt. No. 43-18 at 7-8.  Plaintiffs are incorrect, "such testimony in opposition is not essential to raise a triable issue of fact."  *Tarqui v. United States*, No. 14-CV-3523, 2017 WL 4326542, *5 (S.D.N.Y. Sept. 27, 2017).  Rather, a non-moving defendant may submit "'affidavits and/or deposition testimony and medical records which rebut [the] plaintiff's claim of medical malpractice with factual proof.'"  *Id.* (quoting *Zikianda v. County of Albany*, No. 12-CV-1194, 2015 WL 5510956, *6 (N.D.N.Y. Sept. 15, 2015)).

None of Plaintiffs' cases on the issue are on point.  Both *Oliver v. New York City Health & Hosps. Corp.*, 178 A.D.3d 1057 (2d Dep't 2019) and *Feng v. Accord Physicians, PLLC*, 194 A.D.3d 795 (2d Dep't 2021), discuss whether a defendant is required to submit expert testimony to establish its own *prima facie* case when the defendant had moved for summary judgment. Here, only Plaintiffs have moved for summary judgment, and Defendant is not attempting to

7

establish its own *prima facie case*. Plaintiffs' reliance on *Hutchinson*, 2006 WL 1154822, is similarly misplaced. There, the court found that the defendant's expert's testimony did not rebut the plaintiff's *prima facie* showing because it did not address events during the relevant time period. *Id.* at *8. Accordingly, the *Hutchinson* court found that the defendant did not produce any evidence to rebut the plaintiff's *prima facie* case. The court did not require expert testimony, but instead found that the expert testimony provided was irrelevant to the issues before it. A non-moving defendant, therefore, may create a triable issue of material fact through "affidavits and/or deposition testimony and medical records which rebut [the] plaintiff's claim of medical malpractice with factual proof." *Tarqui*, 2017 WL 4326542, at *5.

**C.     Analysis**

Plaintiffs allege that Dr. Balutowski breached the relevant standards of care by discontinuing Simvastatin[1] and failing to identify clinical warning signs that should have led to a referral to a cardiologist. *See* Dkt. No. 43-18 at 11-12. Specifically, Plaintiffs state the standard of care required continued administration of statin medications in order to maintain the decedent's LDL below one hundred. *Id.* at 9. Plaintiffs offer two expert opinions in support of their *prima facie* case. *See* Dkt. Nos. 43-7, 43-8. Dr. Sachs is board certified in cardiology and Dr. Simonini is board certified in internal medicine. *See* Dkt. No. 43-7 at 12-17; Dkt. No. 43-8 at 13-20. Defendant does not challenge the experts' qualifications or the admissibility of their testimony.

Dr. Sachs testified that the standard of care required Dr. Balutowski to prescribe statin medication, document the physical findings to support the need of cessation for Simvastatin, offer the decedent alternatives to address the side effects, explain to the decedent the risks of cessation,

---

[1] In addition to alleging that discontinuing the Simvastatin itself was a breach of the standard of care, Plaintiffs also allege that the standard of care required Defendant to take certain steps to attempt to keep the decedent on Simvastatin. *See* Dkt. No. 43-18 at 11-12.

8

and offer the decedent alternative statin medications or the same drug at a reduced dose. Dkt. No. 43-7 at 8-9. Dr. Sachs also testified that Dr. Balutowski failed to refer the decedent to a cardiologist, misinformed the patient regarding target LDL cholesterol, and misinterpreted laboratory test results. *Id.* at 9.

Dr. Simonini testified that the standard of care required Dr. Balutowski to "appropriately assess, appreciate, and address" the decedent's high risk of severe coronary heart disease and sudden cardiac death in light of his comorbidities and medical history, which he failed to do. Dkt. No. 43-8 at 9. Dr. Simonini also testified that Dr. Balutowski failed to offer the decedent alternative management strategies to manage the side effects or an alternative statin medication. *Id.* Plaintiffs, therefore, have satisfied their *prima facie* showing by offering detailed expert testimony on the standard of care and that Dr. Balutowski departed from that standard of care.

Plaintiffs' experts also testified that these departures from the standard of care proximately caused the decedent's death. Dr. Sachs testified that "[t]he failure to prescribe statin medication caused direct harm to Jan Sawka by depriving him the chance to avoid a fatal myocardial infarction." Dkt. No. 43-7 at 8. He also testified "that as a direct result of Dr. Balutowski's medical negligence and serial mismanagement, Jan Sawka was exposed to the hazards of progressive atherosclerosis that directly led to his premature demise on August 9, 2012." *Id.* at 9. And Dr. Simonini similarly testified that the departures he identified "proximately caused the premature death of Jan Sawka." Dkt. No. 43-8 at 10. Plaintiffs' experts' testimony is sufficient to establish the proximate cause prong of Plaintiffs' *prima facie* case. Accordingly, Plaintiffs have made a *prima facie* showing and the "burden of production shifts to the defendant to raise a triable issue of fact." *Hutchinson*, 2006 WL 1154822, at *6.

Defendant does not dispute the existence of the standards of care identified by Plaintiffs. Rather, Defendant disputes whether Dr. Balutowski departed from the standards of care, and, if so, whether those departures proximately caused the decedent's death.

First, Defendant argues that Dr. Balutowski did not breach the standard of care which required "the continued administration of statin medications in order to maintain the decedent's LDL below one hundred." Dkt. No. 43-18 at 9. Defendant does not dispute that Dr. Balutowski ceased statin medications for the decedent while his LDL was above one hundred. Defendant instead argues that the cessation of statin medications, given trends in the decedent's LDL and adverse side effects, was an acceptable medical decision. To the extent that Defendant is arguing that the standard of care is incorrect, Defendant provides no evidence that the correct standard of care accounts for trends in LDL or side effects. Defendant, therefore, leaves uncontroverted that Dr. Balutowski departed from the acceptable standard of care by the cessation of a statin medication while the patient's LDL was above one hundred.

Defendant's argument instead goes to proximate cause. "Proximate cause may be determined as a matter of law, but that is so 'when only one conclusion can be drawn.'" *Page v. Monroe*, 300 Fed. Appx. 71, 75 (2d Cir. 2008) (quoting *Bell v. Bd. of Educ.*, 90 N.Y.2d 944, 946, 665 N.Y.S.2d 42, 687 N.E.2d 1325 (1997)). Here, Defendant argues that the decedent "suffered from a myriad of co-morbidities … includ[ing] obesity, Type II diabetes, peripheral vascular disease, and hypertension." Dkt. No. 44 at 18. Moreover, the decedent did not experience a decrease in LDL levels while prescribed the statin medication, but did experience his lowest LDL level of ninety-seven while no longer on the medication and only two weeks before his death. Dr. Sachs testified that "continuous therapy to a target below 100 mg/dl would have successfully mitigated the risk of both fatal and non-fatal myocardial infarction." Dkt. No. 43-7 at 10.

Defendant therefore argues that because the decedent's LDL was ninety-seven two weeks before his death, within the target identified by Plaintiffs' expert, alongside numerous comorbidities, a triable issue of material fact exists.

"The issue of whether a doctor's negligence is more likely than not a proximate cause of a plaintiff's injury is usually for the jury to decide." *Polanco v. Reed*, 105 A.D.3d 438, 439 (1st Dep't 2013); *see also Page*, 300 Fed. Appx. at 75 ("Whether Dr. Monroe's alleged breach of a duty of care was the proximate cause of the Pages' injuries is generally a question of fact for the jury") (citing *Decker v. Forenta LP*, 290 A.D.2d 925, 926 (3rd Dep't 2002) ("It is axiomatic that proximate cause ordinarily is a question to be determined by the finder of fact")). "It is not for the Court at this stage to decide which version of events and which explanation of [Plaintiff]'s injuries is more plausible." *I.M. v. United States*, 362 F. Supp. 3d 161, 194 (S.D.N.Y. 2019) ("Where each side ... tells a story that is at least plausible and would allow a jury to find in its favor, it is for the jury to make the credibility determinations and apportion liability, and not for the court") (citing *Bale v. Nastasi*, 982 F. Supp. 2d 250, 258–59 (S.D.N.Y. 2013)). Defendant has provided a reasonable alternative to Plaintiffs' experts based on evidence in the record. Defendant has offered evidence that the decedent's LDL levels reached the level required by the standard of care two weeks before his death and that the decedent suffered from numerous comorbidities. The Court, therefore, declines to conclude as a matter of law that cessation of the statin medication proximately caused the decedent's death.

Likewise, the Court finds that the other standards of care related to the process of terminating Simvastatin, assuming that Dr. Balutowski departed from them, did not proximately cause the decedent's death. Specifically, Dr. Balutowski's alleged failure to document the reason for discontinuation of a statin, generate a differential diagnosis of the side effects, document

11

physical findings to support the need for cessation of an indicated statin medication, offer alternative medications to address the side effects, explain the risks of stopping the statin, and offer other cholesterol lowering medication to the patient, did not proximately cause the decedent's death for the reasons discussed above.

Next, Plaintiffs made a *prima facie* showing that Dr. Balutowski failed to identify and modify the decedent's coronary atherosclerosis, respond to cardiac abnormalities and clinical warning signs, and refer the decedent to a specialist. Defendant argues that Dr. Balutowski did not depart from these standards of care. Dr. Balutowski testified that no medical records provided to him showed the presence of any abnormalities. *See* Dkt. No. 44-1 at ¶¶ 166-69. Dr. Balutowski was unaware of the decedent's December 2010 EKG and was also unaware that he had left ventricular hypertrophy and some diastolic dysfunction. *Id.* at ¶ 169. Defendant also testified that the cardiac exams he performed on the decedent revealed a normal heart rate and that he was not tachycardic. *See* Dkt. No. 43-5 at 42, 94–95.

Defendant, therefore, has established a triable issue of material fact regarding whether he departed from the relevant standard of care. Whether Dr. Balutowski should have been aware of the December 2010 EKG, as Plaintiffs suggest in their reply, is outside the standards of care identified by Plaintiffs' experts. What information Dr. Balutowski was aware of is not clearly established by the record. Moreover, it is unclear whether the standard of care still required Dr. Balutowski to refer the decedent to a specialist if he did not have access to all of the information that Plaintiffs' experts relied on. Accordingly, Defendant has satisfied its "burden of production to … raise a triable issue of fact." *Hutchinson*, 2006 WL 1154822, at *6. Plaintiffs' motion for summary judgment is therefore denied.

## IV. CONCLUSION

After carefully reviewing the record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Plaintiffs' motion for summary judgment (Dkt. No. 43) is **DENIED;** and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: July 21, 2022
Albany, New York

Mae A. D'Agostino
U.S. District Judge